**Penny A. RICHARDS, Plaintiff,**

v.

**JOHNSON & JOHNSON, et al., Defendants.**

**Case No. 2:08–cv–279.**

United States District Court, E.D. Tennessee, at Greeneville.

Feb. 8, 2010.

Eric W. Reecher, Elliott Lawson & Minor, PC, Bristol, VA, for Plaintiff.

William S. Rutchow, Ogletree, Deakins, Nash, Smoak & Stewart, Nashville, TN, Vance E. Drawdy, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for Defendants.

## *MEMORANDUM AND ORDER*

HARRY S. MATTICE, JR., District Judge.

Plaintiff Penny Richards brought this action against Johnson & Johnson ("J & J"), Reed Group, Ltd. ("Reed Group"), Janssen Pharmaceutica, Inc. ("Janssen"), the Pension Committee of Johnson & Johnson ("Pension Committee"), and the Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies ("LTD Plan" or "Plan").[1] Plaintiff alleges a cause of action under 29 U.S.C. § 1132(a)(1)(B). [Court Doc. 1, Compl.] The Complaint seeks judicial review of a termination of long-term disability ("LTD") insurance benefits under the Plan, which took effect as of January 10, 2007.

Before the Court are Plaintiff's motion for judgment on the pleadings (essentially a motion for judgment on the administrative record) [Court Doc. 30], and Plaintiff's motion to strike a portion of the administrative record [Court Doc. 29]. Pursuant to 28 U.S.C. § 636(b)(1), the Court referred this matter to United States Magistrate Judge Susan K. Lee for a Report and Recommendation ("R & R") on the above motions. Magistrate Judge Lee entered her R & R [Court Doc. 36] on September 30, 2009. Magistrate Judge Lee construed Defendants' response to Plaintiff's Motion to Strike Administrative Record as a cross-motion to strike the record and recommended that both motions to strike be denied. Magistrate Judge Lee further recommended that the termination of Plaintiff's benefits be reversed and that the matter be remanded to Defendant. Finally, Magistrate Judge Lee recommended that Defendant's motion for judgment on its counterclaim be denied. Both Plaintiff and Defendants filed timely objections and responses to those objections. [Court Docs. 37–40.]

For the reasons stated below, the Court **ACCEPTS AND ADOPTS** Magistrate Judge Lee's Report and Recommendation.

## I. STANDARD OF REVIEW

The Court must conduct a *de novo* review of those portions of the R & R to which an objection is made and may ac-

1. The Court will generally refer to these parties collectively as "Defendants" throughout, unless the factual circumstances require the Court to refer more specifically to a single Defendant.

cept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendations. 28 U.S.C. § 636(b)(1)(C). For those portions of the R & R to which objections have been filed, the Court will directly review the decision-making process underlying the Defendant's denial of benefits.

■ A claim under 29 U.S.C. § 1132(a)(1)(B) for denial benefits is to be reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the administrator or fiduciary is afforded discretion by the plan, the decision is reviewed under the arbitrary and capricious standard. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir.2006). The Plan documents here assert that the Pension Committee has discretion to interpret Plan terms. (Administrative Record ("AR") at 489.) This Court will therefore conduct its review under the arbitrary and capricious standard.

■ Under 29 U.S.C. § 1132(a)(1)(B), a court's review is limited to the administrative record as it existed when the plan administrator made its final decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378–79 (6th Cir.2005). Arbitrary and capricious is one of the least demanding forms of review. *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003). "Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential." *Id.* A court must "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.* at 172. If the administrative record does not show that the administrator offered a "reasoned explanation" based on substantial evidence, the decision is ar-

bitrary or capricious. *Moon*, 405 F.3d at 379. Substantial evidence means "much more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McDonald*, 347 F.3d at 171.

## II. FACTS

The report and recommendation outlined the applicable facts at length. The parties have not objected to the facts statement contained in Magistrate Judge Lee's R & R. The Court finds no error in Magistrate Judge Lee's findings of fact. Accordingly, the Court hereby **ADOPTS BY REFERENCE** the entire background section of the R & R. (Court Doc. 36, R & R at 772–76.)

## III. ANALYSIS

### A. Competing Motions to Strike

Plaintiff objects to Magistrate Judge Lee's recommendation that her Motion to Strike parts of the administrative record be denied. (Court Doc. 37, Pl.'s Objs. at 1.) To create the administrative record, Defendants filed the Plan document and Summary Plan Descriptions ("SPDs") for years 2004, 2005, 2006, 2007, and 2008. (AR at 465–494, 31–464.) Plaintiff argues in her Motion to Strike that she was only provided with the SPDs for years 2004 and 2005 prior to this litigation; therefore, the Plan document and SPDs for all other years should be stricken from the administrative record. (Court Doc. 29, Pl.'s Mot. to Strike at 2–3.) Specifically, Plaintiff contends that Defendants failed to comply with various ERISA statutes when they failed to provide her with plan documents and SPDs for other years, especially if any of the documents related to the appeals process Plaintiff followed before commencing this action. (*Id.*) Furthermore, Plaintiff requests that the "track changes" versions of the 2004 and 2005 SPDs currently

in the administrative record be replaced with the "clean" copies of these documents that were provided to Plaintiff. (*Id.* at 4.)

Defendants' pleading in response was construed by Magistrate Judge Lee as a competing Motion to Strike. (R & R at 777 n. 6.) Defendants asserted that the Plan document, included in the page numbers that Plaintiff seeks to strike, must remain part of the record because it was considered in the decision to terminate Plaintiff's benefits. (Court Doc. 32, Def.s' Resp. to Mot. to Strike at 3, 5–7.) Defendants conceded that Plaintiff's request to strike SPDs from years 2006, 2007, and 2008 was proper because those documents were not used in the decision-making process. (*Id.* at 3–4, 8.) Defendants argued, however, that the SPDs from years 2004 and 2005 should also be stricken from the record, as no SPD was used or considered when deciding to terminate Plaintiff's LTD benefits. (*Id.* at 7–8.) Magistrate Judge Lee found that all of the documents filed as part of the administrative record comprised the facts available to the plan administrator when the decision was made to terminate Plaintiff's benefits. (R & R at 777.) Magistrate Judge Lee concluded, therefore, that the Court could properly review all of the submitted documents in evaluating Plaintiff's claim, and recommended that both Motions to Strike be denied. (*Id.*)

The Court notes that Plaintiff's objection offers no additional support for her Motion to Strike and simply refers to her previously filed memoranda. (Pl.'s Objs. at 1–2.) After reviewing the report and recommendation and the record in this case, the Court agrees with Magistrate Judge Lee's conclusion that all of the documents filed should remain part of the administrative record. The Court further notes that the overall record in this case has both the "track changes" and clean copies of SPDs for 2004 and 2005, and the Court has reviewed the "clean" copy when necessary; however, the Court sees no cogent purpose in disturbing the numbered administrative record to officially replace these documents. Therefore, Plaintiff's objections are **OVERRULED** and the Court **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's recommendation to deny both Motions to Strike.

### B. Statute of Limitations

Neither party objected to Magistrate Judge Lee's conclusion that Plaintiff's claim was timely because the limitations period in the Plan document did not apply. (R & R at 779–80.) Accordingly, the Court **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's recommendation on this issue and adopts by reference that section of her R & R. (R & R at 777–81.)

### C. Factors to Consider Under Arbitrary and Capricious Standard

#### 1. *Conflicts of Interest*

Plaintiff objects to Magistrate Judge Lee's finding that there was no structural conflict of interest or bias that affected her claim for LTD benefits. (Pl.'s Objs. at 2.) Magistrate Judge Lee reviewed the structure of the LTD payments and determined that the Pension Committee, not Johnson & Johnson, reviewed claims for benefits, and that all LTD benefits were paid out of a trust funded only by employee contributions. (R & R at 782–83.) Therefore, because Johnson & Johnson neither made the eligibility decisions nor paid benefits from an account that contained employer contributions, Magistrate Judge Lee found that there was no structural conflict of interest. (*Id.*) Magistrate Judge Lee also reviewed Plaintiff's assertion that a conflict of interest existed based on Defendants' knowledge that Plaintiff's claim would cost Johnson & Johnson almost one million dollars. Magistrate Judge Lee

found that this evidence was insufficient because Defendants' knowledge of the cost of Plaintiff's claim could not alone establish bias. (*Id.* at 782–83.)

Plaintiff did not assert any new argument or evidence in her objection to these findings and instead simply referred the Court to her earlier memoranda. (Pl.'s Objs. at 2.) In an ERISA case, there is a conflict of interest "where it is the employer that both funds the plan and evaluates the claims.... The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008). The Court agrees with Magistrate Judge Lee's conclusion that no structural conflict of interest exists. Johnson & Johnson does not fund the benefit plan in question, and there is a separate Pension Committee that evaluates the claims and makes determinations as to eligibility for benefits. This is a very different structure compared to the one contemplated in *Glenn,* and Magistrate Judge Lee properly found that it did not constitute a structural conflict of interest. Accordingly, the Court **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's finding that no structural conflict of interest existed that affected Plaintiff's claim.

Plaintiff failed to provide any additional evidence of bias on objection; therefore, the Court finds that Plaintiff has not asserted any significant evidence to prove that a conflict of interest existed because Defendants' decision was only motivated by cost saving considerations. The Court notes again that Johnson & Johnson did not determine eligibility for benefits; therefore, its mere knowledge of the possible amount of the claim is not "significant evidence" that the cost savings motivated Defendants' decision to deny Plaintiff's LTD benefits claim. *See Muse v. Central States,* 227 F.Supp.2d 873, 877 (S.D.Ohio 2002). The Court concludes that Plaintiff failed to provide evidence that a conflict of interest influenced Defendants' decision. Accordingly, the Court also **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's finding that Plaintiff has not proven any conflict of interest due to bias. Plaintiff's objections on both points are therefore **OVERRULED.**

### 2. *Inconsistency with Social Security Disability Award*

Plaintiff objects to Magistrate Judge Lee's finding that there was no inconsistency between the determination that Plaintiff was totally disabled for Social Security Disability ("SSD") benefits and Defendants' determination that Plaintiff was not eligible for LTD benefits. (Pl.'s Objs. at 2.) Defendants also object to this finding; however, Defendants assert that Magistrate Judge Lee misunderstood the language in a letter sent to Plaintiff concerning the denial of her appeal, and due to this misunderstanding, Defendants did not take the position that Plaintiff was *not* totally disabled except in the context of Plaintiff's refusal to complete the scheduled independent neuropsychological examination ("INE"). (Def.s' Objs. at 8–9.) Defendants assert that the statement that Plaintiff had not substantiated her disability only meant that she could not classify as Totally Disabled under their definition because she had not cooperated with the INE. (*Id.*)

Magistrate Judge Lee found that there was no inconsistency between Plaintiff's award of SSD benefits and Defendants' termination of Plaintiff's benefits, if Defendants' reason for termination was that Plaintiff did not cooperate with the Plan when she did not participate in the INE. (R & R at 783.) Magistrate Judge Lee also found, however, that Defendants' statements in a letter denying Plaintiff's

appeal created an inconsistency with Plaintiff's award of SSD benefits because the letter indicated that there was insufficient documentation of Plaintiff's disability. (*Id.* at 783.)

The Court finds that Plaintiff's objection is not relevant because Magistrate Judge Lee did find an inconsistency between the award of SSD benefits and the denial of LTD benefits; her initial finding that there was no inconsistency was premised on accepting the reasoning that Defendants raise consistently as the basis for terminating Plaintiff's benefits—that she did not cooperate with the terms of the Plan when she failed to participate in the January 2007 INE. Magistrate Judge Lee found that there *was* an inconsistency, however, because for all intents and purposes, the alleged failure of Plaintiff to attend the INE led Defendants to terminate benefits based on the assertion that they lacked sufficient information to determine that she was totally disabled.

When Defendants initially terminated Plaintiff's benefits, the letter stated as follows:

> We have attempted to obtain the documentation necessary to certify your ongoing disability. To facilitate this process, we requested you to submit to an Independent Medical Examination (IME) on January 10, 2007 at 8:30 am with Kristie J. Nies, Ph.D.
>
> . . .
>
> According to the IME report of 1/10/2007 from Dr. Kristie J. Nies, "Planned testing could not be completed." ... As a result, Dr. Nies was unable to diagnose your current condition or address your current work capabilities.
>
> Additionally, as per the requirements of the Johnson & Johnson LTD Plan, **it is your responsibility to provide proof of continuing disability as requested.** After a thorough and careful review of

your claim, it is our opinion that you are no longer eligible to receive benefits under the Plan as you have not provided proof that you are "disabled" as defined by the provisions of your employer's Long–Term Disability Plan. **As such, your LTD status will cease as of 1/10/2007.**

(AR at 698–99.) (emphasis in original). Therefore, Defendants' initial decision was based on a lack of information to substantiate Plaintiff's disability, and that lack of information was directly tied to Plaintiff's failure to participate in the INE. The relevant portions of the letter sent to Plaintiff denying her first appeal are also reproduced below:

> Based upon the review of the submitted medical documentation, we have determined that the documentation does not substantiate your disability as defined by the Johnson & Johnson LTD Plan:
>
> > *In no event shall a Participant be considered Totally Disabled or remain Totally Disabled for purposes of this Plan, and no benefit under this Plan shall be payable:*
> >
> > > *● On or after the date a Participant fails or refuses to attend an examination by a Provider or Plan Provider at the Claims Service Organization's or Plan Administrator's request.*
> >
> > . . .
> >
> > *Failure or refusal by the Participant to cooperate in the medical evaluation, including refusal to release medical or other records, refusal to submit to a medical examination, or refusal to cooperate on working with reasonable accommodation, shall constitute grounds for termination [sic] benefits under the Plan.*

(*Id.* at 739.) (emphasis in original). This letter then repeats statements made in the letter terminating benefits regarding

Plaintiff's failure to participate in the January 2007 INE. (*Id.*) Magistrate Judge Lee construed the first quoted sentence as indicating that Defendants had terminated benefits based on a lack of information from which to determine if Plaintiff was totally disabled, and found that this statement, made on May 8, 2007, was inconsistent with Plaintiff's SSD award of January 23, 2007.

Defendants now contend that Plaintiff's benefits were terminated *solely* because of her failure to participate in the INE. (Def.s' Objs. at 8; Court Doc. 34, Def.s' Resp. at 17–18.) Defendants claim, therefore, that the statement in the appeal denial letter about a lack of medical documentation to substantiate disability "refer[s] only to the exclusion of Plaintiff from the definition of Total Disability in light of her refusal to cooperate in the INE." (Def.s' Objs. at 9.) The Court cannot accept this explanation as valid. When Defendants initially terminated Plaintiff's benefits, they informed her of her right to appeal and stated that she should "submit any written comments, documents, records, or other information relating to your claim that you believe appropriate." (AR at 699.) Defendants also stated that "Reed Group's Appeal Administrator will provide you with a *full and fair review* of your claim and this benefit denial decision. The review on appeal will take into account *all comments, documents, records, and other information submitted that relates to the claim, even if not previously submitted or not considered in the initial decision.*" (*Id.*) (emphasis added). When Plaintiff submitted her initial letter indicating that she was appealing the termination, she received a letter from Defendants which states that "additional supporting medical information is necessary *to determine whether or not you qualify for Long Term Disability benefits.*" (*Id.* at 723.) After much correspondence between Reed Group and Plaintiff regarding non-receipt of the initial letter, Plaintiff responded by procuring her records from Broadspire, the company that handled her claim prior to Reed Group, and sent them to Reed Group for review. (*Id.* at 723–25, 730–38.) Defendants' log of activity on Plaintiff's claim contains a notation that they received medical records on April 30, 2007 and May 3, 2007, and a notation on April 30, 2007 that the denial would be upheld because Plaintiff "did not supply medical information to support why she could not do IME." (*Id.* at 806–07.)

This was not the appeal review promised in Plaintiff's termination letter. The termination letter clearly stated that Plaintiff lacked documentation to certify her ongoing disability, not that she lacked documentation to prove that she was unable to complete the INE. (*Id.* at 698–99.) Plaintiff offered more medical records to cure the lack of information available to Defendants when they terminated her benefits, but it appears that this additional documentation was essentially ignored and Defendants changed their reasoning to make the termination solely about Plaintiff's incomplete INE. It was not until the letter denying Plaintiff's first appeal that Defendants stated that they required information to explain why Plaintiff could not participate in the INE. (*Id.* at 739.) Even this statement begins with the word "additionally," as if it is a secondary issue to the fact that Defendants apparently lacked information to certify Plaintiff's disability. (*Id.*) Essentially, however, even if Defendants claim that they required information to establish why Plaintiff could not participate in the INE, all of Defendants' assertions to justify the termination of benefits circle back to the main issue—*Defendants did not have enough information to determine if Plaintiff was totally disabled for any occupation.* Regardless of Defendants' claims, the Court cannot ignore the plain language of these letters, and the

letters indicate that the incomplete INE and the lack of information are inextricably linked. Together, this formed the basis for terminating Plaintiff's benefits.

Accordingly, although a termination of Plaintiff's benefits for failure to participate in the INE would not create an inconsistency with an SSD award, a termination for lack of information to substantiate disability certainly does. Because Plaintiff's incomplete INE led to allegedly insufficient information for Defendants to review to determine Plaintiff's disability status, there is an inconsistency with the SSD award. If the Social Security Administration had sufficient information with which to determine that Plaintiff was totally disabled, Defendants likely also had sufficient information to make a disability determination. Instead, they made no determination either way and terminated Plaintiff's benefits based on an alleged lack of information due to the incomplete INE.

Defendants' own language makes it impossible to separate the INE from the assertion of insufficient information, and the Court cannot accept Defendants' contention that the termination was solely based on Plaintiff's failure to participate in the INE. Accordingly, the Court rejects Defendants' objection to Magistrate Judge Lee's finding in this regard. The Court agrees that there was an inconsistency with the finding of total disability by the Social Security Administration and Defendants' denial of benefits based on a lack of information to certify Plaintiff's disability, and will consider this factor in reviewing Defendants' decision under the arbitrary and capricious standard. Therefore, the Court **OVERRULES** Plaintiff's and Defendants' objections and **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's conclusion that an inconsistency with the SSD award existed and should be considered.

### D. Defendants' Decision to Terminate Plaintiff's LTD Benefits Was Arbitrary and Capricious

Defendants object to Magistrate Judge Lee's finding that the termination of Plaintiff's benefits was procedurally and substantively arbitrary and capricious. (Def.s' Objs. at 5–7.) Magistrate Judge Lee reviewed the procedure pursuant to which Defendants terminated Plaintiff's benefits and determined that Defendants did not explain how Plaintiff failed to *cooperate* with the Plan requirements when she did not complete the INE. (R & R at 784.) Magistrate Judge Lee found that this failure indicated that Defendants did not properly follow the required procedures to explain to Plaintiff why her benefits were being terminated, and this was procedurally arbitrary and capricious. (*Id.* at 784.) Defendants merely cited the Plan language in its termination and appeal denial letters, but never explained how they reached the conclusion that Plaintiff was not cooperating with the Plan. (*Id.*)

Magistrate Judge Lee also found a substantive abuse of discretion because Defendants terminated Plaintiff's benefits for failing to cooperate with the INE, but did not have the discretion to interpret the word "cooperate" so broadly. (*Id.* at 784–85.) Magistrate Judge Lee concluded that Plaintiff's objections to participating in the INE were reasonable because there was sufficient evidence on the record to indicate that Plaintiff was cooperative, but medically unable to complete the battery of testing. (*Id.* at 784–86.)

Defendants assert that there was substantial evidence in the record to support the decision to terminate Plaintiff's benefits and the decision was not arbitrary or capricious. (Def.s' Objs. at 2.) More specifically, Defendants claim that Plaintiff's inability to participate in the INE is not

credible because Plaintiff did not tell Reed Group that she was medically unable to complete the INE when she first corresponded with them in November 2006 regarding the initially scheduled date for the INE. (*Id.* at 3–4.) Defendants also contend that the medical proof does not establish that Plaintiff was medically unable to complete the INE; therefore, Defendants' decision to terminate Plaintiff's benefits was valid. (*Id.* at 5–6.)

The crux of Defendants' first point is that, if Plaintiff was actually unable to complete the INE, she would have informed Reed Group accordingly when she called in November 2006 regarding the initial INE appointment. (*Id.* at 3–4.) Defendants scheduled Plaintiff's INE for November 29, 2006, and sent Plaintiff a notice of this appointment. (AR at 800.) Plaintiff called Reed Group upon receiving the letter on November 10, 2009, and merely told the representative that she had a previously scheduled neurological appointment on that day that could not be cancelled. (*Id.*) Plaintiff did not state that she was medically unable to participate in an INE until the examination was rescheduled for January 10, 2007. When Plaintiff received notification of the rescheduled INE, she called Reed Group on January 2, 2007 and informed the representative that she was unable to attend an eight hour test. (*Id.* at 801.) The Court notes that Defendants quote portions of entries from Reed Group's activity log that highlight Plaintiff's demeanor and attitude during both conversations, but the fact that Plaintiff was "rude," "manipulative," or "confrontational" on the phone does not provide sufficient evidence to find that Plaintiff's claim was not credible. Instead, the Court finds Plaintiff's assertion that she had not consulted with her treating physicians prior to the November 2006 phone call to be more persuasive as the explanation for Plaintiff's failure to inform Reed Group at that time of her inability to complete the INE. (Pl.'s Resp. at 5–6.) Because Plaintiff called immediately upon receiving notice of the letter advising of the appointment, Plaintiff did not have the opportunity to seek advice from her physicians, and it is unlikely that Defendants would have credited her own, lay opinion. (*Id.*)

The Court also finds that Defendants did not properly explain the termination of Plaintiff's benefits. Defendants claim that Plaintiff's benefits were terminated because of her failure to cooperate with the INE, but the letter terminating Plaintiff's benefits concentrated solely on the alleged lack of medical documentation available to substantiate her disability. (AR at 698.) It said nothing about a failure on Plaintiff's part to explain why she could not participate in the INE. (*Id.*) The letter sent to Plaintiff in April during the appeals process likewise did not state that Plaintiff needed to provide documentation of her inability to participate in the INE; instead, that letter stated that "additional supporting medical information is necessary to determine *whether or not you qualify for Long Term Disability benefits.*" (*Id.* at 723.) (emphasis added). It was only in the letter denying Plaintiff's first appeal that Defendants stated that "[a]dditionally, you did not supply any medical documentation with your appeal request to support *why you were medically unable to complete the IME.*" (*Id.* at 739.) (emphasis added).

The Court cannot credit Defendants' assertion that it terminated Plaintiff's benefits due to her failure to participate in the INE because the evidence on the record demonstrates that Defendants failed to even make such a statement, and certainly failed to adequately explain their contention that they did not have sufficient medical documentation. Instead, Defendants merely stated that there was a lack of

medical proof to certify Plaintiff's disability, and cited from Plan language that no individual will be considered disabled if they "refuse[ ] to cooperate with respect to the evaluation of his/her Total Disability or continuing Total Disability." (*Id.* at 698.) The Court agrees with Magistrate Judge Lee's finding that Defendants completely failed to explain how Plaintiff's refusal to participate in the INE for medical reasons was a failure to cooperate with the evaluation of her disability. Furthermore, by failing to explain this conclusion and failing to indicate that Defendants sought information as to why Plaintiff could not participate in the INE, Defendants completely failed to provide Plaintiff with the information necessary to properly appeal the termination. This directly conflicts with Defendants' duties under 29 C.F.R. § 2560.503–1(g), because Defendants were required to explain what additional information would be necessary to perfect Plaintiff's claim. Instead, Defendants neglected to inform Plaintiff that Dr. Hollandsworth's letter was unacceptable. In addition, Defendants neglected to request any information verifying Plaintiff's inability to participate in the INE until after they had already denied Plaintiff's first appeal. This failure made it essentially impossible for Plaintiff to appeal her claim successfully. Therefore, the Court agrees with Magistrate Judge Lee's finding that Defendants' termination of Plaintiff's benefits was procedurally arbitrary and capricious.

The Court also finds that Plaintiff's inability to participate in the INE is supported by the medical evidence available in the record, and that her failure to participate was not a refusal to cooperate with the evaluation of her disability. Instead, Plaintiff had a valid and reasonable claim that she was medically incapable of participating in a six to eight hour psychological test. Plaintiff was initially diagnosed with relapsing and remitting multiple sclerosis ("MS") in 2004. (*Id.* at 601.) In August 2005, Plaintiff began experiencing problems with anxiety and was referred for a psychiatric evaluation. (*Id.* at 511.) At the time of the evaluation, Plaintiff noted no problems with the MS treatment, but in retrospect, this may have been the beginning of significant MS-related cognitive changes in Plaintiff. (*Id.* at 512.) Dr. Inocalla indicated that Plaintiff was "very anxious and upset" and that she had "mood changes in the interview, expressing sadness, worry, anxiety, and confusion." (*Id.*) Dr. Inocalla described Plaintiff's symptoms as significant and restricted her from working at that time. (*Id.* at 513.) Broadspire apparently asked Plaintiff to seek a second opinion on her condition in August or September of 2005. Plaintiff's psychiatrists, Dr. Inocalla and Dr. Douglass, wrote a letter to Broadspire explaining Plaintiff's condition and her inability to participate in a six to eight hour examination-presumably an extensive round of psychological testing. (AR at 528–30.) The letter states, in relevant part:

> [W]e do not believe Ms. Richards can sit through a 6 to 8 hour examination at this time. As previously stated, she is in a fragile frame of mind just now, panic has increased, and paranoia regarding job related issues is at high level. She is easily decompensated, cries easily in our interviews, mood is labile, self-esteem is plunging, and cognitively she is not herself as she describes what she is normally like.
>
> ...
>
> [I]t is our position to intervene when the stability of our patient is involved. We feel this situation could very well worsen Ms. Richards already existing psychiatric symptoms.

(*Id.*) Plaintiff did participate in an independent medical examination, however, in October 2005. The INE apparently had to be conducted over the course of two days,

which was longer than expected for a six to eight hour examination that can usually take place within one day. (*Id.* at 537, 541.) Dr. Lawhon described Plaintiff as "anxious and depressed," "overwhelmed," and displaying symptoms of post traumatic stress disorder and generalized anxiety disorder. (*Id.* at 534–36.) Plaintiff exhibited "emotional decontrol" during the testing, was "almost hysterical at times," and there was no evidence of malingering. (*Id.* at 537.) Dr. Lawhon indicated that she was not able to function in her occupation and stated that "there may be some cognitive impairment related to both the psychiatric disorder and to symptoms associated with multiple sclerosis." (*Id.* at 539–40.)

In January 2006, Dr. Simnad wrote that Plaintiff's MS medication, Rebif, appeared to be increasing Plaintiff's mood lability. (*Id.* at 607.) Dr. Simnad noted that Plaintiff had experienced a stroke-like event in December 2005, during which Plaintiff was initially paralyzed on her left side and was admitted to the hospital for evaluation. (*Id.* at 607–08.) After a week in the hospital, Plaintiff had difficulty ambulating and was involved in additional therapy for weeks after the incident. (*Id.* at 608.) Plaintiff submitted to an INE with Dr. Kathleen Fuchs on March 6, 2006, and Dr. Fuchs found that "there has been significant compromise in [Plaintiff's] cognitive functioning.... Additionally, it appears that consistent with her MS diagnosis, there has been compromise in her cognitive efficiency such that she would be unable to return to work. [Plaintiff] appears to be totally disabled from a cognitive and emotional standpoint." (*Id.* at 625.) Dr. Fuchs noted that Plaintiff ambulated stiffly with a cane, exhibited widely varying moods, and was cooperative with the examination, but was often confused and dis-

tracted and had difficulty concentrating. (*Id.* at 622–24.)

When Plaintiff received notice of the November 2006 appointment for the INE, she had just contacted Reed Group in late October to inform them that she was hospitalized for three weeks due to a severe allergic reaction to Copaxone, the medication she was taking for MS. (AR at 800.) Plaintiff also informed Reed Group that she was starting IVIG therapy as an outpatient every 10 days for six months. (*Id.*) In late November, Reed Group received a medical abstract from Dr. Inocalla and Dr. Douglass, Plaintiff's psychiatrists, after an appointment on November 10, 2006. (*Id.*) The psychiatrists had sent the document to the State of Tennessee Department of Human Services to assist Plaintiff's application for SSD benefits, and it indicates that Plaintiff's psychiatry team was closely following her MS treatment, as the MS and psychological symptoms were interrelated. (*Id.* at 650–653.) As such, the doctors had received medical records regarding her MS treatment and stated that "[Plaintiff] is noted to have increased lesions in the brain, with the last report we received showing almost triple the number since she was first diagnosed with MS.... Her latest mental status in our office, on 11–10–06, revealed a significant decrease in cognitive ability." (*Id.* at 652.) The psychiatrists also noted that "[w]ithout a doubt, our treatment team sees this patient's primary disability as being Multiple Sclerosis .... we have determined she is totally disabled at this time and will remain so ... unless/until the status of her Multiple Sclerosis changes." (*Id.* at 652–53.) Plaintiff's cognitive disorder and generalized anxiety disorder were noted to be secondary to her diagnosis of MS.[2] (*Id.* at 653.)

---

**2.** The Court notes that this conflicts with Reed Group's records, which list Plaintiff's primary disability as "Anxiety Disorder, Gen-

eralized." (AR at 797.) MS does appear as a diagnosis, but this notation has a diagnosis

The Attending Physician Statement filled out on November 10, 2006 by Dr. Inocalla indicated that Plaintiff's mental/nervous impairment was a Class 5 (severe limitations) and noted that Plaintiff's psychiatric symptoms were organic, stemmed from MS, and were unlikely to reverse. (AR at 644–45.) Dr. Inocalla also marked that Plaintiff was totally disabled for her own job or any other job, and that no change in this status was expected in the future. (*Id.*) On November 29, 2006, Plaintiff's primary care physician, Dr. Hollandsworth, filled out an Attending Physician Statement and indicated that Plaintiff had Class 5 severe limitations in regards to physical impairment. (*Id.* at 673–75.) Dr. Hollandsworth indicated that Plaintiff was totally disabled from any occupation without expected change and noted that Plaintiff had a "chronic noncurable condition" and that multiple attempts at treatment had failed. (*Id.*)

When Plaintiff called Reed Group on January 2, 2007, she stated that she was physically unable to participate in a six to eight hour INE, and Reed Group's representative advised her to obtain a statement from her physician to that effect. (*Id.* at 801.) At Plaintiff's request, Dr. Hollandsworth faxed a letter to Plaintiff and Reed Group, although it is uncertain when Reed Group received this letter. (*Id.* at 683.) The letter states that Plaintiff has "multiple disabling neurologic symptoms which are unequivocally and solely a result of her multiple sclerosis. Due to the severity of her symptoms she is medically unable to complete a standard neuropsychological battery." (*Id.*) The Court finds that this statement, read in context with the volume of medical records documenting Plaintiff's condition, is credible without the need for further information.

In addition to Plaintiff's medical records and Dr. Hollandsworth's letter, there is evidence that Plaintiff was experiencing problems on the day of the scheduled INE. Plaintiff arrived as scheduled, gave Dr. Nies the letter from Dr. Hollandsworth, and stated that she was not refusing the INE, but could not participate. (*Id.* at 688.) Dr. Nies observed that Plaintiff ambulated with a cane and her husband's assistance, and that Plaintiff required help to complete the forms because her right hand was bandaged. (*Id.*) Plaintiff stated in her second appeal letter that it took her three hours to get ready that morning. (*Id.* at 764.)

The medical evidence before the Court is persuasive that Plaintiff's condition was serious and that she was experiencing progressively worsening physical and neuro-

date of October 24, 2006, the day that Plaintiff called to inform Reed Group of her hospitalization for the reaction to Copaxone. (*Id.* at 798.) Plaintiff claims that this was only the second contact she had with Reed Group after they took over the claims originally handled by Broadspire. (*Id.* at 759.) In addition, Reed Group's letter to the doctor scheduled to conduct Plaintiff's INE, Dr. Nies, states that "Ms. Richards has been losing time from work primarily due to a diagnosis of 300.02 Anxiety Disorder, Generalized since 8/8/2005." (*Id.* at 687.)

Plaintiff wrote in her second appeal letter that she questioned the need for an INE rather than an IME with a neurologist, and was informed by Reed Group that her LTD bene-

fits were based on a diagnosis of PTSD, not MS. (*Id.* at 762.) The Court wonders if the independent *neuropsychological* examination was ordered based on Plaintiff's "primary" disability of Anxiety Disorder, when Plaintiff's true disability was MS and MS-related psychological symptoms that might have been better reviewed for the "any occupation" transition through an independent *medical* examination with a neurologist. Some of this confusion might be attributed to the switch from Broadspire to Reed Group, but the Court is not entirely convinced that Reed Group handled this claim appropriately when all the available medical records are considered.

logical symptoms as her MS treatments failed. The fact that Plaintiff was able to submit to an INE in March 2006 does not convince the Court that she was able to do so nearly a year later, particularly considering that Plaintiff had recently experienced a medical emergency that resulted in an extended hospital stay and additional therapy. There is also every indication that Plaintiff cooperated with Reed Group's request that she submit to an INE, to the extent possible. Plaintiff cooperated with Reed Group's request for a doctor's letter to certify that she was unable to participate in the INE, and she arrived at the scheduled time for the INE with the letter that had also been faxed to Reed Group a week earlier. If Dr. Hollandsworth's letter was not sufficiently detailed, Reed Group could have contacted him to inquire about Plaintiff's status and her ability to participate in an INE with possible accommodations at a later date. If Reed Group needed multiple doctors to confirm Plaintiff's inability to participate in the INE and comment on her medical conditions, Reed Group could have informed Plaintiff of this need, and Plaintiff likely would have complied accordingly. For that matter, Reed Group could have inquired of Plaintiff herself how or when she might be able to participate in an INE.

Reed Group took none of those actions; instead, Defendants terminated Plaintiff's benefits for refusal to cooperate with the evaluation of her disability. This was in the absence of any evidence that Plaintiff was refusing to cooperate with the Plan requirements, and Defendants have not advanced any valid evidence that Plaintiff was medically able to participate in the INE but willfully refused to cooperate with this evaluation. Accordingly, the Court finds that Defendants' decision to terminate Plaintiff's benefits was substantively arbitrary and capricious. The Court therefore **OVERRULES** Defendants' objections to Magistrate Judge Lee's finding that Defendants' decision was procedurally and substantively arbitrary and capricious. The Court **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's findings in this regard, as well as her conclusion that Plaintiff's motion for judgment on the pleadings should be **GRANTED** to the extent that it requests a reversal of Defendants' termination of benefits for being arbitrary and capricious.

### E. Retroactive Benefits

Plaintiff objects to Magistrate Judge Lee's conclusion that retroactive benefits should not be awarded because Defendants had not determined if Plaintiff was totally disabled for any occupation. (Pl.'s Objs. at 2–3; R & R at 786–88.) Magistrate Judge Lee found that Defendants' explanation for their denial of Plaintiff's LTD benefits was best interpreted as a statement that Defendants had insufficient information from which to determine if Plaintiff was totally disabled for any occupation. (R & R at 786–87.) Magistrate Judge Lee found that Defendants' determination that it had insufficient evidence to make that eligibility determination was not arbitrary and capricious, and therefore concluded that an award of retroactive benefits would be inappropriate, as Defendants had not made that decision. (*Id.*)

The Court agrees with Magistrate Judge Lee that Defendants essentially terminated Plaintiff's benefits because there was a lack of information available to them at the time to substantiate Plaintiff's disability. Pursuant to Defendants' Plan requirements, Defendants had to determine if Plaintiff was totally disabled from performing any occupation before granting permanent LTD benefits. (AR at 9.) There cannot be an award of retroactive LTD benefits based on a determination that Plaintiff is eligible for permanent, any occupation LTD benefits, because no such determination was ever made by Defen-

dants.[3] Furthermore, the Court cannot make the determination that Plaintiff was totally disabled as of January 10, 2007. Because the Plan at issue gives the administrator authority to determine eligibility, the Court can only review Defendants' decision to terminate benefits under the arbitrary and capricious standard. *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 291–92 (6th Cir.2005). Accordingly, the Court **OVERRULES** Plaintiff's objection and **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's conclusion that an award of retroactive benefits by this Court would be inappropriate.

### F. Defendants' Counterclaim

Defendants object to Magistrate Judge Lee's conclusion that Defendants were not entitled to the $3,314.78 in overpayments to Plaintiff because the decision to terminate Plaintiff's benefits was arbitrary and capricious. (Def.s' Objs. at 13.) Defendants requested this alleged overpayment from Plaintiff when they denied her benefits as of the back date of January 10, 2007. Because the Court has agreed with Magistrate Judge Lee's conclusion that Defendants' decision to deny Plaintiff's benefits was arbitrary and capricious, the Court also agrees with the conclusion that Defendants are not entitled to the alleged overpayment of benefits. Accordingly, Defendants' objections are **OVERRULED** and the Court **ACCEPTS** and **ADOPTS** Magistrate Judge Lee's conclusion that Defendants' counterclaim be **DENIED.**

### G. Attorneys' Fees

Plaintiff objects to Magistrate Judge Lee's finding that her request for attorneys' fees is premature, but only asserts this objection to the extent necessary to preserve the opportunity to re-file such motion at the appropriate time. (Pl.'s Objs. at 3.) The Court agrees with Magistrate Judge Lee's determination and finds that Plaintiff's request for attorneys' fees is currently unripe, but Plaintiff may file such motion at the appropriate juncture. Accordingly, Plaintiff's objection is **OVERRULED** and the Court **ACCEPTS** and **ADOPTS** that portion of Magistrate Judge Lee's report and recommendation.

## IV. CONCLUSION

Based on the above, the Court **ORDERS** the following:

---

**3.** The Court does not find that Defendants' failure to make a disability determination rises to the level of arbitrary and capricious conduct for two reasons. First, the Court notes that Defendants did not have the record of Plaintiff's March 2006 INE with Dr. Fuchs at the time they terminated her benefits, and that report may substantially assist in Defendants' determination. Although the Court acknowledged that there was an inconsistency between the Defendants' assertion that they did not have sufficient information to make a disability determination and Plaintiff's SSD award, the Court agrees with Magistrate Judge Lee that this inconsistency carries little weight under the circumstances present in this case.

Second, the Court notes again that some of the problems surrounding this termination of benefits could be attributed to the switch from Broadspire to Reed Group as the entity that handled Plaintiff's LTD claim. Furthermore, because Reed Group's notes reflect that Plaintiff's primary disability is generalized anxiety disorder rather than multiple sclerosis, Reed Group's designation of her disability and method of substantiating that disability may need to be reviewed and adjusted accordingly. The volume of medical records relating to Plaintiff's progressive condition as a result of MS is substantial and very consistent. There may be a way for Defendants to substantiate Plaintiff's disability using the medical records currently available in the record. Failing that, perhaps Defendants can assess what examination would be necessary to independently verify Plaintiff's disability, and provide accommodations for Plaintiff if there is a reasonable basis for Plaintiff to assert that such an examination would aggravate her medical condition.

- Magistrate Judge Lee's Report and Recommendation [Court Doc. 36] is **ACCEPTED AND ADOPTED** in its entirety;
- Plaintiff's Objections [Court Doc. 37] to Magistrate Judge Lee's Report and Recommendation are **OVERRULED;**
- Defendants' Objections [Court Doc. 38] to Magistrate Judge Lee's Report and Recommendation are **OVERRULED;**
- Plaintiff's and Defendants' Motions to Strike [Court Docs. 29 & 32] are **DENIED;**
- Defendant's Counterclaim [Court Doc. 21] is **DENIED;**
- Plaintiff's Motion for Judgment on the Pleadings [Court Doc. 30] is **GRANTED;**
- Defendants' decision to terminate Plaintiff's LTD benefits is **REVERSED;** and
 - Plaintiff's claim is **REMANDED** to Defendants for a determination of whether Plaintiff is totally disabled under the "any occupation" standard.

### *REPORT AND RECOMMENDATION*

SUSAN K. LEE, United States Magistrate Judge.

Plaintiff Penny Arvidson Richards ("Plaintiff") brought this ERISA[1] action seeking reinstatement of long term disability ("LTD") benefits. Based on the pleadings, the parties were "deemed to have moved for judgment in their respective favor based upon the administrative record," and the motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 14].

### I. INTRODUCTION

Plaintiff alleges that Defendants Johnson & Johnson, Reed Group, LTD ("Reed Group"), Janssen Pharmaceutica, Inc., The Pension Committee of Johnson & Johnson ("Pension Committee"), and the Long Term Disability Income Plan for Choice Eligible Employees of Johnson & Johnson and Affiliated Companies ("Plan") (collectively "Defendant")[2] improperly denied her long term disability ("LTD") benefits under the Plan [Doc. 1, 19]. Defendant (other than Reed Group) asserted a counterclaim seeking recovery of $3,314.78 in alleged overpayments of LTD benefits [Doc. 21 at 27–31]. The parties have fully briefed their motions for judgment on the Administrative Record ("Record" or "AR") [Doc. 30, 34, 35]. The parties also disagree with respect to whether certain portions of the Record should be stricken, and this matter has also been fully briefed [Doc. 29, 32, 33]. Addressed herein are: (1) Plaintiff's objection and motion to strike portions of the Record and Defendant's cross motion to strike other portions of the Record [Doc. 29, 32]; (2) Plaintiff's motion for judgment on the Record [Doc. 30]; and (3) Defendant's motion for judgment on the counterclaim.[3]

---

1. Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

2. Defendants are hereafter referred to collectively as "Defendant" except where necessary to differentiate between the various entities. Defendant Reed Group became the third party administrator for the Plan on April 1, 2006 (AR 628). Its predecessor, Broadspire Services, Inc. ("Broadspire"), is not a named party in this action (AR 554). Nonetheless, where appropriate, actions of Broadspire, who was the agent of the Plan, are referred to as the actions of Defendant.

3. Defendant has not filed a motion for judgment on the pleadings concerning the counterclaim for reimbursement of the alleged $3,314.78 overpayment. As the Court's referral and scheduling order provides all parties are deemed to have moved for judgment in their respective favor based upon the Record [Doc. 14], to the extent the alleged $3,314,78 overpayment is addressed in the Record, Defendant is deemed to have moved for judgment on the pleadings on the counterclaim.

After carefully reviewing the Record and the parties' motions and supporting pleadings, I **RECOMMEND** that: (1) the cross motions to strike the Record be **DENIED**; (2) Plaintiff's motion for judgment on the Record be **GRANTED IN PART** and **DENIED IN PART**; (3) Defendant's decision terminating Plaintiff's LTD benefits under the Plan be **REVERSED** and this matter be **REMANDED** to Defendant; and (4) Defendant's motion for judgment on the counterclaim be **DENIED.**

## II. BACKGROUND

Plaintiff, who has a Masters of Business Administration degree from Averatt University, was working as a sales representative for Jansen Pharmaceuticals when in July, 2004, she had "an abrupt syncopal event" and lost consciousness (AR 511–12, 598). She was awarded short term disability ("STD") benefits in August, 2004 (AR 495), but returned to work some time thereafter (AR 535). In November, 2004, Virginia Simnad, M.D., diagnosed Plaintiff with relapsing/remitting multiple sclerosis ("MS"), with "wax[ing] and wan[ing]" symptoms (AR 601, 818). In March, 2005, Plaintiff began to believe that her superiors were harassing her and that someone was trying to harm her, but it is unclear whether her fears were based on actual events or paranoia (AR 535). After experiencing "major disorientation," Plaintiff sought emergency psychiatric treatment from Marilou Inocalla, M.D. and Anderson Douglass, M.D. (AR 755–56). Plaintiff apparently took pride in her work and wanted to continue working (AR 514, 520, 536), but followed the recommendation of Dr. Inocalla that she avoid the stress of work (AR 513). Dr. Inocalla concluded "I cannot release [Plaintiff] to work at this time as her psychiatric symptoms of anxiety and panic are significant." (*Id.*).

So, Plaintiff began her second period of STD on August 8, 2005 (AR 554). On August 30, Defendant referred Plaintiff for a "standard battery" independent neuropsychological examination ("INE") (AR 515). Drs. Inocalla and Douglass wrote to Defendant jointly, opining that the scheduled test could worsen Plaintiff's "severe" psychiatric symptoms, which included a "fragile frame of mind," panic, labile mood, plunging self-esteem, paranoia, difficulty with recall, and decompensation (AR 519–20). They reported Plaintiff was willing to undergo the exam, but was worried about having "to go over painful issues again" (AR 518). The doctors were concerned the scheduled test might harm Plaintiff to such a degree that she would have to move from outpatient to inpatient treatment (AR 520). In September of 2005, a consulting psychologist reviewed Plaintiff's file and concluded that although Drs. Inocalla and Douglass believed Plaintiff could not perform her job, "it cannot be substantiated that the claimant would have been unable to perform the core elements of her occupation, from a psychological perspective . . . ." (AR 531).

In October, 2005, Plaintiff participated in the requested INE, which was conducted by Dr. Lawhon (AR 532–40). According to Plaintiff, the INE was postponed to accommodate her fragile state of mind and was conducted over the course of three days rather than one [Doc. 30 at 4], but the Record contains only the cryptic comment of Dr. Lawhon that "[t]he evaluation took longer than expected." (AR 534). Dr. Lawhon observed that Plaintiff "became overwhelmed" and was "emotional and almost hysterical at times" (AR 534, 537). Dr. Lawhon noted Plaintiff was cooperative with the evaluation and her symptoms were "true and genuine," with no evidence of malingering (AR 532, 537). He concluded Plaintiff was clinically anxious and depressed and suffered from generalized anxiety disorder and post-traumatic stress disorder (AR 538). In addition, he noted the appearance of

"some impairment in critical thinking and judgment" and a possibility of cognitive impairment related to the psychiatric disorder and the MS (AR 538, 540). He opined Plaintiff "d[id] not appear to be able to function as a sales representative ...." (AR 538).

In December, 2005, Plaintiff experienced weakness and numbness or paralysis in the left side of her body and was admitted to the hospital after seeking treatment in the emergency room (AR 545–47). Defendant was aware that after this episode, Plaintiff required help in bathing, dressing, cooking, cleaning, shopping, and climbing stairs (AR 812). A week after her discharge, Plaintiff was ambulatory, but needed support on one side (AR 608). Plaintiff's STD benefits were set to expire in February, 2006, so Defendant advised Plaintiff in December, 2005, to submit an application for LTD benefits. In conjunction with her application for LTD benefits, Plaintiff signed a reimbursement agreement agreeing to repay any overpayment of benefits (AR 563). Plaintiff was determined to be totally disabled and her claim for LTD benefits was approved in January, 2006, with an effective date of February 6, 2006 (AR 588, 590). Under the Plan, a claimant is totally disabled when, for a period of twelve months after the expiration of STD benefits, she is unable to perform the essential functions of her regular occupation, and if the disability extends beyond that twelve-month period, unable to perform "any job" (AR 472–73). In the approval letter, Defendant noted Plaintiff's claim was being approved under the "regular occupation" definition of Total Disability, and that if her period of disability lasted longer than twelve months, her claim would be "reevaluated" under the "any job" definition of disability (AR 590).

Dr. Simnad commented in January, 2006, that Plaintiff's notable symptoms were fatigue, cognitive difficulties (particularly in multitasking), and mood lability (AR 609). Dr. Simnad was concerned Plaintiff's medications were exacerbating her mood instability (AR 610). Around that same time, Dr. Karen Johnston noted Plaintiff had "episodes of decreased visual focus" (AR 613). Dr. Johnston's primary concern, however, was cognitive function, and Dr. Johnston recommended neuropsychological testing if Plaintiff's condition did not improve.

In March, 2006, Dr. Kathleen Fuchs performed a neuropsychological examination of Plaintiff.[4] Dr. Fuchs observed Plaintiff used a cane to ambulate, and her gait was effortful, stiff, and slow (AR 622). Plaintiff's problem solving and executive functioning skills were within normal limits, but "below expectation relative to her baseline abilities." (AR 624). In addition, Plaintiff seemed "to be experiencing some unusual ideas that may include some magical thinking or delusional beliefs," and her thought processes were "marked by confusion, distractibility, and difficulty concentrating." (*Id.*). Dr. Fuchs opined that it was "likely [Plaintiff was] experiencing a disabling level of anxiety, symptoms of depression, and perhaps symptoms of mania," and was "very concerned" Plaintiff was suffering from bipolar disorder (AR 625). Dr. Fuchs further opined that, "con-

4. The report of Dr. Fuchs' examination of Plaintiff is in the Record, but Defendant notes it was not made available until *after* Plaintiff's benefits were terminated and her first appeal was denied (AR 821). Dr. Fuchs' report was prepared in March of 2006, just before Broadspire was replaced by Reed Group as the third party administrator for the Plan (AR 620–28). Dr. Fuchs' report was not in Plaintiff's file with Broadspire (AR 821). However, Plaintiff provided Dr. Fuchs' name as one of her physicians in response to Reed Group's November 2006 request for attending physician statements and authorization for release of medical information (AR 637, 674).

sistent with her MS diagnosis, there ha[d] been compromise in her cognitive efficiency such that she would be unable to return to work." (*Id.*). Plaintiff "appear[ed] to be totally disabled from a cognitive and emotional standpoint" (*id.*). Dr. Fuchs concluded Plaintiff "appeared to demonstrate her best effort," and the test results were valid (AR 622). Although Dr. Fuchs noted Plaintiff's affect varied considerably during testing, she did not note that Plaintiff had any difficulty completing the test (AR 622).

Plaintiff was required under the Plan to apply for Social Security disability ("SSD") benefits (AR 496, 594), and with the assistance of Defendant (through its agent), she did so (AR 565–66, 596). In July, 2006, her SSD claim was denied (AR 634). The denial letter explained that, although she was unable to perform her past job, her physical limitations were not severe enough to prevent her from doing "less demanding" work (AR 636). On November 16, 2006, Drs. Inocalla and Douglass (psychiatrists) and Dr. John Ludgate, Ph.D. (psychologist) wrote jointly to the state agency responsible for disability determinations and explained that Plaintiff's "organic" psychiatric symptoms resulted from physical changes brought about by MS (AR 647). They observed the number of Plaintiff's brain lesions had tripled since her diagnosis in 2004, and she suffered from "significant decrease in cognitive ability" (AR 648). Based in part on that opinion, Plaintiff was determined to be eligible for SSD benefits on December 21, 2006 (AR 676–77). The Social Security Administration ("SSA") also explained that Plaintiff's inability to walk without assistance justified their determination that she was unable to perform her past work or any other less demanding work. (AR 636,

677, 695). Defendant received notice of Plaintiff's SSD award in January, 2007 (AR 803).

In September, 2006, Plaintiff experienced a severe reaction to one of her medications and was hospitalized for three weeks (AR 652, 744, 760). After she was released, Plaintiff telephoned Defendant to report her hospitalization (AR 760, 800). Curiously, with the exception of Plaintiff's phone call to Defendant (AR 800) and a letter sent to Defendant during the appeals process (AR 760–61), Plaintiff's hospital stay is not directly documented in the Record.[5] Due to the failure of traditional "first line" treatments, Plaintiff began experimental intravenous immune globulin ("IVIG") therapy (AR 652, 761).

Plaintiff's eligibility for LTD benefits under the "regular occupation" definition of Total Disability was set to expire in February, 2007. In preparation for her reevaluation under the "any job" definition of Total Disability, Defendant wrote to Plaintiff in October, 2006, to request that she provide "attending physician statements" from her treating physicians (AR 637). On November 22, 2006, Defendant received the attending physician statement from Dr. Inocalla, who opined Plaintiff was totally disabled with respect to her previous job or any other job, and her condition was unlikely to change in the future (AR 645). Dr. Inocalla explained that Plaintiff's psychiatric symptoms were caused by her MS, and these "organic symptoms" would "most likely" not reverse (*id.*). Dr. Inocalla noted that Plaintiff's condition was "serious" and that she "should avoid stress [because of] cognitive impairment[ ] and physical limitations." (*Id.*). Also on November 22, 2006, Drs. Inocalla, Douglass, and Ludgate faxed a copy of their Novem-

---

**5.** Plaintiff's account is corroborated, however, by other details in the Record (AR 652, 671, 673–75).

ber 16, 2006, letter to the state agency, in which they set forth what Defendant called a "comprehensive abstract" explaining their conclusion (AR 800, 814). On November 29, 2006, Defendant received the attending physician statement from Dr. Hollandsworth, who similarly opined Plaintiff was totally disabled from any job and was not expected to improve (AR 675). Dr. Hollandsworth explained that Plaintiff had a "chronic noncurable condition" and "multiple failed therapies" (*id.*). Defendant incorporated these attending physician statements into Plaintiff's file (AR 799–800).

On November 8, 2006, before receiving the attending physician statements, Defendant informed Plaintiff she had been scheduled for another INE with Dr. Kristie Nies, whose areas of expertise include brain injury and malingering (AR 642, 681). The appointment was originally scheduled for November 29, 2006, but was rescheduled for January 10, 2007, because Plaintiff had a conflicting appointment with her neurologist on the earlier date (AR 800–02). Defendant asked Dr. Nies to determine whether Plaintiff was capable of performing any occupation, and if not, whether her condition could be expected to change (AR 643). When Plaintiff was informed of the 6–8 hour exam, she called Defendant, upset that she was being required to attend (AR 680, 800). Plaintiff told Defendant that she had "a progressive disease" and that an INE was unnecessary (AR 800). She also informed Defendant she was "unable" to attend an eight-hour test (AR 801). Defendant advised Plaintiff to submit a letter from her doctor to that effect (*id.*).

Dr. Hollandsworth prepared such a letter and faxed it to Defendant on December 7, 2006. In it, he stated Plaintiff had been diagnosed with MS, was under his care, and was experiencing "multiple disabling neurological symptoms which are unequiv-

ocally and solely a result of her [MS]." (AR 683). Dr. Hollandsworth opined that "[d]ue to the severity of her symptoms, she [was] medically unable to complete a standard neuropsychological testing battery." (*Id.*). Defendant acknowledged receipt of this letter and incorporated it into the "case review for [Plaintiff's] any occ[upation] transition" (AR 801–02).

On January 5, 2007, Defendant telephoned Plaintiff and informed her that she was still expected to keep her appointment with Dr. Nies (AR 802). On the scheduled date, Plaintiff arrived at Dr. Nies' office (AR 688). She walked with a cane and with the assistance of her husband, and she needed help completing forms because her right hand was bandaged (*id.*). Plaintiff informed Dr. Nies she could not complete the test because of her "doctor's orders" (*id.*). According to Dr. Nies, Plaintiff was "adamant that she was not refusing the [INE]," but "equally adamant that she could not answer questions or participate in any way" (*id.*). Dr. Nies telephoned Defendant, concerned about potential legal liability if she attempted to persuade Plaintiff to participate despite her treating physician's orders (AR 802). Defendant instructed Dr. Nies to continue with the INE, who in turn encouraged Plaintiff to participate, but Plaintiff declined to do so (AR 689, 802).

Dr. Nies conducted a review of Plaintiff's records and concluded she had insufficient information to determine whether Plaintiff was capable of performing any occupation (*id.*). Plaintiff telephoned Defendant on April 20, 2007, stating she had been physically unable to complete the INE (AR 805). Defendant asked her if she was currently capable of performing an INE or would be amenable to completing an INE if it were to be rescheduled. According to a notation in the Record by Defendant, Plaintiff answered only that

she was late for a doctor's appointment (*id.*). According to a letter in the Record written by Plaintiff, however, Plaintiff answered she would be amenable to taking the test if possible (AR 765). Defendant later acknowledged (without necessarily accepting) Plaintiff's version of events (AR 818).

On February 7, 2007, Defendant terminated Plaintiff's benefits retroactive to January 10, 2007, "due to non-compliance for failing to participate in the [INE]" (AR 803). Defendant informed Plaintiff of that decision by letter the next day (AR 698). Defendant notified Plaintiff of her right to appeal, and instructed her to "state the reason(s) you believe benefits were improperly denied and submit any written comments, documents, records, or other information relating to your claim that you believe appropriate." (AR 699).

Defendant also informed Plaintiff by letter that the benefits she received after January 10 were "overpayments" that she would be expected to repay (AR 700). Plaintiff responded she did not consider the overpayments to be a "bona fide obligation" until her appeals were exhausted, and she appealed the termination of her benefits (AR 704, 712). In addition, Plaintiff requested "any and all documents which relate to my claim for benefits," including, among other things, publications, books, pamphlets, and memoranda (AR 714). Defendant responded to the request, but did not produce either the Plan documents or records of Plaintiff's condition from Broadspire, the third party administrator for the Plan prior to April 1, 2006 (AR 628, 737–38). Concerned that Defendant did not have all her records, Plaintiff procured 97 pages of documents directly from Broadspire and mailed them to Defendant in late April, 2007 (AR 737–38).

On April 30, 2007, Defendant denied Plaintiff's first appeal because she "did not supply any medical information to support why she could not participate in the [INE]." (AR 806). Plaintiff was notified of this decision by letter dated May 8, 2007, in which Defendant explained "you did not supply any medical documentation with your appeal request to support why you were medically unable to complete the [INE]." (AR 726, 739). Plaintiff requested a second appeal on July 7, 2007, explaining that in the four months prior to the requested INE, she had spent 23 days in the hospital and had been in no condition to undergo the full-day examination (AR 743–44). Plaintiff described to Defendant events which otherwise appear only scarcely, if at all, in the Record. These included her September, 2006, hospitalization, and her March 2006 neuropsychological examination with Dr. Fuchs (AR 758–61). With respect to the INE, Plaintiff informed Defendant that Dr. Douglas Wright, the neurologist who was supervising her IVIG treatments, also did not believe she was physically able to withstand a comprehensive INE, but that Dr. Wright felt a letter from Dr. Hollandsworth would be more appropriate given their longer treatment relationship (AR 671, 673–75, 763). Finally, Plaintiff summarized the evidence supporting her disability, noting that all the medical opinions and SSD determination were in agreement that she was totally disabled from any occupation (AR 743–50).

On August 23, 2007, Defendant denied Plaintiff's appeal "for lack of compliance with the Plan requirement to cooperate with respect to the evaluation of your disability." (AR 810, 822). Fourteen months later, Plaintiff filed this suit.

## III. ANALYSIS

### A. Parties' Competing Motions to Strike Portions of the Record

As a preliminary matter, Plaintiff moves to strike certain Plan documents from the

Record on the ground that Plaintiff was not provided with those documents until after the commencement of litigation [Doc. 29]. The Record (as submitted by Defendant) includes certain Plan documents, as well as Summary Plan Descriptions ("SPDs" or "SPD" if singular) for years 2004 through 2008. Plaintiff argues that because she was provided only with the 2004 and 2005 SPDs, only those documents should be considered by the Court [Doc. 29, 33]. Defendant responds that the Plan documents must remain a part of the Record because the Pension Committee considered them when reviewing Plaintiff's claim [Doc. 32, 32–1]. Defendant further argues that the SPDs it allegedly inadvertently included in the Record should be excluded because they were not considered when reviewing Plaintiff's claim.[6]

■ A court's review of a denial of benefits under ERISA is limited to the "facts known to the plan administrator at the time he made his decision." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). This includes all the evidence actually considered by the administrator and the documents which describe the benefits plan itself, including SPDs. *See Brooking v. Hartford Life and Accident Ins. Co.*, 167 Fed.Appx. 544, 547 n. 4 (6th Cir.2006); *Bass v. TRW Employee Welfare Benefits Trust*, 86 Fed.Appx. 848, 851 (6th Cir.2004).

I **FIND** each of the documents at issue was part of the facts known to the plan administrator at the time of the decision. I therefore **CONCLUDE** all the documents in the Record originally submitted by Defendant properly may be considered

by the Court in reviewing Defendant's decision. Accordingly, I **RECOMMEND** that Plaintiff's motion to strike certain Plan documents [Doc. 29] and Defendant's motion to strike the SPDs be **DENIED**.

### B. Plaintiff's ERISA Claim
#### 1. Statute of Limitations

The Plan provides: "Any lawsuit filed by or on behalf of a Participant regarding the denial of a claim may be commenced only after a decision regarding the claim has been rendered on the second level of appeal and may not be commenced later than twelve months following the notice of the final determination on appeal." (AR 478). The 2004 and 2005 SPDs, in contrast, state only that "[s]econd level appeals determinations are final and binding."[7] (AR 96, 180). Defendant argues Plaintiff's claim is time-barred because it was brought fourteen months after the denial of Plaintiff's second appeal [Doc. 34 at 13]. Plaintiff responds that the twelve-month limitations period is inapplicable because of the SPDs' silence, and in the alternative, that the period should be equitably tolled.

#### a. Contractual limitations period

■ Plaintiff argues the twelve-month limitations period specified in the Plan is not applicable. ERISA does not contain its own statute of limitations, and where a plan does not specify a limitations period, courts apply the "most analogous state law statute of limitations." *Redmon v. Sud–Chemie Inc. Ret. Plan for Union Employees*, 547 F.3d 531 (6th Cir.2008). In Tennessee, courts borrow the six-year statute

---

6. Defendant's argument was not submitted as a motion to strike the SPDs from the Record, but construing the pleadings liberally, it will be treated as such.

7. Plaintiff did not receive any SPD documents after the 2005 SPD [Doc. 30 at 2, 34 at 14–15]. The 2006 SPD, which is also in the

Record, was amended to include the limitations period (AR 266), but its insertion was not accompanied by a change in the table of contents (AR 248–49). In 2007, the SPD included both a paragraph stating the limitations period and a heading in the table of contents (AR 337).

of limitations for contract claims. *Massengill v. Shenandoah Life Ins. Co.,* 459 F.Supp.2d 656, 659 (W.D.Tenn.2006). Where, however, a plan specifies a different limitations period, the plan provision will be applied so long as it is reasonable. *Med. Mut. of Ohio v. k. Amalia Enters.,* 548 F.3d 383, 390 (6th Cir.2008). Plaintiff does not argue that a one-year limitations period is unreasonable, but instead argues the parties' relationship is governed by the 2004 and 2005 SPDs, which do not contain the twelve-month limitations period [Doc. 35 at 2].

▮ As Plaintiff points out, if the terms of an SPD and a plan differ, the terms of the SPD will control because it is unfair "to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan." *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988) (quoting *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir. 1985)). However, a mere "inconsistency" between an SPD and a plan is insufficient to invoke this rule; instead, the SPD and plan must "directly conflict." *Valeck v. Watson Wyatt & Co.,* 92 Fed.Appx. 270, 272 (6th Cir.2004).

Here, the SPD does not specify a different limitations period than the Plan, but is merely silent as to the existence of a limitations period. The question, therefore, is whether an SPD's silence can create a direct conflict with a plan. This Court has previously held that an SPD's silence does not trump provisions contained in the plan. *Moon v. White,* 909 F.Supp. 1047, 1055 (E.D.Tenn.1993) (Jordan, District Judge). Subsequent to *Moon,* however, the Sixth Circuit decided *Helwig v. Kelsey–Hayes Co.,* which held that an SPD's silence could create a direct conflict with an ERISA plan. 93 F.3d 243, 246, 249–50 (6th Cir.

1996); *see also Schornhorst v. Ford Motor Co.,* 606 F.Supp.2d 658, 673 (E.D.Mich. 2009) ("where an SPD entirely omits a requirement or limitation that is set forth in the underlying plan document, the courts have routinely concluded that the SPD conflicts with the plan"). In *Helwig,* the plan contained conditions allowing the termination of benefits, but the SPD's description of benefits did not mention that they could be terminated. On those facts, the court held that the SPD governed the parties' relationship. 93 F.3d at 249–50.

It appears *Helwig'*s rule, however, must be limited to those instances where the SPD omits information it is required by law to contain. In *Helwig,* the court found it significant that ERISA requires an SPD to include information explaining "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 93 F.3d at 249 (quoting 29 U.S.C. § 1022(b)); *see also Haus v. Bechtel Jacobs, Co., LLC,* 491 F.3d 557, 565 (6th Cir.2007) (explaining that "[w]here an employer fails to satisfy the disclosure obligations [for SPDs], such that the information contained in a summary plan description is in conflict with that of the plan itself, it is logical that the courts enforce the terms of the. summary plan."). In *Bolone v. TRW Sterling Plant Pension Plan,* by contrast, the court held there was no direct conflict between the SPD and the plan when the SPD was silent with respect to the plan administrator's discretion. 130 Fed.Appx. 761, 765 (6th Cir.2005). Although the court in *Bolone* did not distinguish *Helwig,* it is significant that SPDs are not required to disclose that the plan administrator has discretion to deny claims. *See Wald v. Southwestern Bell Corp. Customcare Medical Plan,* 83 F.3d 1002, 1006 (8th Cir.1996). Similarly, the court held in *Sprague v. General Motors Corp.* that the principle that SPDs govern when there is a conflict with the

plan "does not apply to silence." 133 F.3d 388, 401 (6th Cir.1998). The court's rationale, however, rested on the observation that "a summary will not include every detail of the thing it summarizes." *Id.* If the SPD omits information that, by law, it *must* include, the reasoning in *Sprague* is inapposite. Indeed, the *Sprague* court noted that it was merely "declin[ing] to apply the judge-made rule of *Edwards* in such a way as to augment the detailed disclosure provisions of the statute," indicating the holding was limited to situations in which the statutory disclosure provisions do not apply. *Id.* at 402.

Complicating matters further, *Morrison v. Marsh & McLennan Cos., Inc.* held that when a limitations period was contained in the SPD, but not the plan, the documents had "no conflicting language." 439 F.3d 295, 301–02 (6th Cir.2006). The court noted, however, that it was not deciding whether its holding would apply if the beneficiary had detrimentally relied on the plan's silence. *Id.* at 302, n. 3. Thus, *Morrison's* holding does not necessarily extend to the situation here, in which the SPD, rather than the Plan, is silent. In *Morrison*, there was no evidence that the employee had relied on the plan's silence, *id.*, but an employee's reliance on an SPD is *presumed. See Helwig*, 93 F.3d at 247, 249 (noting that employees do not have to prove detrimental reliance in order to take advantage of the language in the SPD if they "could reasonably have relied" on the SPD); *Edwards*, 851 F.2d at 136 (plan administrator should have realized that the SPD *"could* or would have caused … employees to rely on [the] inadvertent misrepresentation") (emphasis added). Where the SPD is required by law to contain specific information, it is certainly reasonable for an employee to expect it to do so.

Finally, in *Clark v. NBD Bank*, the court examined a plan and SPD similar to the documents at issue in this case. 3 Fed.Appx. 500, 504–05 (6th Cir.2001). In *Clark*, as here, the plan contained a limitations period which was not mentioned in the SPD. *Id.* Despite the employee's lack of notice of the limitations period, the court held she was bound by it. *Id.* However, the court decided *Clark* on the narrow question of whether the limitations period should have been equitably tolled and did not address whether there was a conflict between the SPD and the plan. *Id.*

This Court must decide whether *Helwig's* holding survives these later cases. Despite broad language in the later opinions, it appears that it must. Only *Helwig* dealt with the existence of a conflict between a plan and SPD in which the SPD omitted information it was required by law to contain. In addition, the rationales of *Sprague, Bolone*, and *Morrison* support the importance of that distinction. Moreover, none of the later opinions distinguish *Helwig*, and it cannot be assumed that one Sixth Circuit panel has overruled, *sub silentio*, the prior decision of another panel. *See United States v. Young*, 580 F.3d 373, 378–80 (6th Cir.2009). Thus, the *Helwig* rule appears intact. Incidentally, this rule is consistent with the earlier holding of this Court in *Moon*, in which the SPD's silence did not create a conflict with the plan *because* the plaintiff did not establish that the SPD omitted anything required by law. 909 F.Supp. at 1055.

Applying *Helwig*, the SPD's silence with respect to the existence of a limitations period for seeking judicial review *does* create a direct conflict with the Plan's twelve-month limitations period. An SPD is required by law to contain "[t]he procedures governing claims for benefits …, *applicable time limits*, and remedies available under the plan for the redress of claims which are denied in whole or in part." 29

C.F.R. § 2520.102–3(s) (emphasis added). It must also include "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). I **CONCLUDE** the SPDs were required by law to contain the shortened limitations period. *See Manginaro v. Welfare Fund of Local 771*, 21 F.Supp.2d 284, 293 (S.D.N.Y.1998) (holding that 29 U.S.C. § 1022(b) required the SPD to include the shortened limitations period).

Here, Plaintiff's suit was filed fourteen months after notice of denial of the second appeal. [Doc. 1] & (AR 810–22). The Plan requires any lawsuit to be brought within twelve months after such notice (AR 478), but there is no dispute that Plaintiff did not have a copy of the Plan until after the commencement of litigation [Doc. 30 at 2, 34 at 15]. The SPDs with which Plaintiff had been provided do not mention the twelve-month limitation period (AR 96, 180). And, although the SPDs state that beneficiaries are entitled to copies of the Plan at their request (AR 73, 156), Plaintiff's request for "any and all documents which relate to my claim" was not answered with a copy of the Plan (AR 719). Thus, because the SPDs in this case are silent with respect to the applicable time limit for seeking judicial review of a denied claim, and because it was reasonable for Plaintiff to rely on the SPDs' silence when deciding when to file her claim, I **CONCLUDE** the twelve-month limitations period in the Plan does not govern the parties' relationship. *See Helwig* 93 F.3d at 247, 249. Under the applicable state law statute of limitations, Plaintiff's claim is timely. *See Massengill*, 459 F.Supp.2d at 659.

### b. Equitable tolling

 Furthermore, even if the twelve-month limitations period was applicable, I **CONCLUDE** the period should be equitably tolled. In determining whether to toll an ERISA limitations period, courts consider five factors: (1) lack of actual notice, (2) lack of constructive notice, (3) diligence of the plaintiff in pursuing her rights, (4) absence of prejudice to the defendant, and (5) the reasonableness of the plaintiff's ignorance of the limitations period. *Clark v. NBD Bank*, 3 Fed.Appx. 500, 504 (6th Cir.2001) (citing *Andrews v. Orr*, 851 F.2d 146, 150 (6th Cir.1988)). Defendant argues against tolling because Plaintiff had "access to the [P]lan and the pertinent information upon her request." [Doc. 34 at 15]. Plaintiff responds that, of the five *Clark* factors, only constructive notice is arguably in favor of Defendant's position [Doc. 35 at 3].

First, Plaintiff lacked actual notice. Again, there is no dispute that Plaintiff lacked a copy of the Plan before she filed her lawsuit [Doc. 30 at 2, 34 at 15]. Furthermore, the letter denying Plaintiff's second appeal (the event which triggered the limitations period) contained no mention of the limitations period, nor even any mention of Plaintiff's right to file suit as required by 29 C.F.R. § 2560.503–1(j)(4) (AR 810–22). Second, Plaintiff was diligent in pursuing her rights. She promptly submitted documents supporting her claim throughout the appeals process (e.g., AR 737–38) and asked for all the documents relating to her claim after her appeal was denied (AR 719). Third, Defendant does not suggest that a two month delay will cause it any prejudice, and the Court perceives none. Fourth, it was reasonable for Plaintiff to be ignorant of the limitations period; indeed, her ignorance may be laid squarely at the doorstep of Defendant, who failed to include this important information in the SPD.

Fifth, and finally, Defendant leans heavily on *Clark*, which held that where an employee had "access" to the plan containing the limitations period, equitable tolling was not warranted. 3 Fed.Appx. at 504–

05. Defendant argues Plaintiff had access to the Plan because the 2005 SPD states that a beneficiary under the Plan is entitled to "[o]btain, upon written request to the Plan Administrator, copies of documents governing the Plan." (A.R. 156). Defendant's reliance on Plaintiff's "access," however, is misplaced. To be sure, Plaintiff had a right to access the Plan documents, but when Plaintiff requested "any and all documents which relate to my claim for benefits," Defendant did not produce a copy of the Plan (AR 719). Moreover, *Clark* is distinguishable from the present case because, unlike the employee in *Clark*, Plaintiff was diligent in pursuing her rights. *Clark*, 3 Fed.Appx. at 504 ("overriding factor" was that the employee was not diligent in pursuing her rights).

Therefore, even assuming *arguendo* that the twelve-month limitations period is applicable, I **RECOMMEND** it be equitably tolled.

### 2. Standard of review.

In order to articulate the appropriate standard of review, the Court must first identify the decision at issue and determine whether the plan gave the administrator discretion in making that decision. Here, both the initial termination of Plaintiff's benefits and the denial of her second appeal were based exclusively on Plaintiff's failure to complete the scheduled INE with Dr. Nies, which Defendant characterized as "fail[ure] or refus[al] to cooperate with respect to the evaluation of [Plaintiff's] disability" and "refus[al] to submit to a medical examination" (AR 698, 822). In addition, in the denial of Plaintiff's first appeal, Defendant asserted the termination of benefits was justified because Plaintiff failed "to provide proof of continuing disability as requested," (AR 699) and because the "medical documentation ... d[id] not substantiate [Plaintiff's] disability ...." (AR 739).

The Plan provides in pertinent part that the Pension Committee "may exercise discretion in making determinations of fact, interpreting the terms of the Plan, adopting rules and taking other actions with respect to which it has authority." (AR 489). The Plan also gives the Pension Committee the authority to delegate its discretion to a third party (AR 490). Each of the decisions at issue in this case is covered by this discretionary grant of power. For example, whether Plaintiff "refuse[d] to cooperate" with the requested evaluation of her disability requires an interpretation of that term. Similarly, whether the documentation in the administrative record "substantiate[s]" Plaintiff's disability is a determination of fact subject to the administrator's discretion.

■ Where the administrator of an ERISA benefits plan has discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's decisions must be affirmed unless they are "arbitrary and capricious." *Calvert v. Firstar Finance Inc.*, 409 F.3d 286, 291–92 (6th Cir.2005). If it is possible to offer a "reasoned explanation" for the decision, based solely on the evidence known to the administrator, then the decision is not arbitrary and capricious. *Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir.2000); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). This standard is not demanding, but neither is it toothless. *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 169, 172 (6th Cir.2003). Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2350, 171 L.Ed.2d 299 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a

deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660 (6th Cir.2006) (*aff'd*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)). To be "substantial," evidence must be adequate, in light of the entire record, to reasonably support the conclusion. *See Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir.2007) (noting that selective review of the record is an abuse of discretion). And, to engage in a "deliberative, principled reasoning process," the administrator must do more than state a conclusion; it must logically apply the relevant evidence to the appropriate contractual standard. *See Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir.2009) (failure to adequately explain decision will support a remand to the plan administrator); *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 556 (6th Cir.2008) ("explanation of the decision-making process" was inadequate where administrator simply stated a conclusion); *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 618–19 (6th Cir.2006) (where administrator did not logically explain why medical data supported conclusion about claimant's work ability, decision was arbitrary and capricious).

### 3. Application of the arbitrary and capricious standard.

■ The court's evaluation of the plan administrator's decision under the arbitrary and capricious standard of review is informed by several factors, including the existence of a conflict of interest and the administrator's consideration of an award of Social Security benefits. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444–45 (6th Cir.2009).

### a. Conflict of interest

■ Plaintiff argues Defendant was operating under a conflict of interest in terminating her benefits [Doc. 35 at 6]. In the ERISA context, two sorts of conflict are possible: (1) a structural or "inherent" conflict and (2) a specific, individual "bias." *See Klein v. Central States*, 346 Fed.Appx. 1, 4–5 (6th Cir.2009) (unpublished). A structural conflict of interest exists when the plan administrator both evaluates and pays benefits claims. *Glenn*, 128 S.Ct. at 2348. On the other hand, when decisionmakers receive no "personal financial benefit" from approving or denying claims, there is no structural conflict. *Klein*, 346 Fed.Appx. at 4–5. A "bias" conflict of interest is case specific, and requires plaintiff to show the decision was motivated by cost saving considerations. *Id.* In making this showing, it is not enough that the decisionmaker was aware of the costs involved or considered the legal ramifications of the decision. *Id.* If there is a conflict of either sort, courts take its severity into account when determining whether an administrator has abused its discretion, affording it more weight where other circumstances indicate it may have affected the ultimate decision. *DeLisle*, 558 F.3d at 445.

Defendant notes initially that the trust from which LTD benefits are paid is funded solely by employee contributions and eligibility decisions are made separately by the Pension Committee [Doc. 34 at 16]. Plaintiff responds that a conflict of interest exists nonetheless, pointing out that as long as Plaintiff remained on LTD leave, she also remained entitled to health and life insurance, which are funded by contributions from both Johnson & Johnson and employees (AR 70–72, 497). The termination of Plaintiff's LTD benefits therefore stood to save Johnson & Johnson a substantial amount of money. Contrary to Plaintiff's argument, Johnson & Johnson may have had a financial interest in the decision, but it was not the entity making the decision. Instead, the Pension Com-

mittee was responsible for determining benefits eligibility (AR 489).

It appears that Defendant went to great lengths to avoid a conflict of interest. Benefits were paid from the trust, and the trust was funded solely by employee contributions (AR 72, 492). Furthermore, "[n]either the Company nor the Pension Committee [was] liable to provide any benefits under the Plan ...." (AR 492). Accordingly, I **FIND** no structural conflict of interest existed.

Plaintiff argues further that the Pension Committee was predisposed to deny her claim because "[i]n this case, [the Claims Service Organization's] own calculations reveal that [Plaintiff's] LTD claim stood to cost [Defendant Johnson & Johnson] nearly $1 million ...." [Doc. 30 at 14]. Plaintiff submits no other evidence of bias against her claim, and Defendant's awareness of the dollar amount of a claim is insufficient to establish a conflict of interest. *See Klein,* 346 Fed.Appx. at 4–5. I **FIND** Plaintiff has not shown any bias against her claim.

### b. Award of Social Security Disability benefits

■■■ As noted above, another factor in evaluating whether the decision was arbitrary and capricious is whether the plan administrator took inconsistent positions with respect to the claimant's eligibility for Social Security disability ("SSD") benefits. *Bennett v. Kemper Nat'l Servs.,* 514 F.3d 547, 554 (6th Cir.2008). If the plan administrator (1) encourages the applicant to apply for SSD, (2) financially benefits when the applicant is determined to be disabled and receives an award of benefits, and (3) then fails to explain why it takes a different position on the question of disability, the inconsistency will weigh in favor of finding that the decision was arbitrary and capricious. *Id.*

Plaintiff argues this factor weighs in her favor because Plaintiff was required under the Plan to apply for SSD benefits and her LTD benefits were offset by her SSD award (AR 496, 695). Defendant responds the factor is irrelevant because Defendant did not ever determine whether Plaintiff was disabled, but rather terminated her benefits because she did not participate in the INE [Doc. 34 at 17–18]. With respect to the decision to terminate Plaintiff's LTD benefits because of her "refus[al] to cooperate," Defendant's contention is correct. I **FIND** there is no inconsistency between the conclusions that Plaintiff was disabled for purposes of SSD benefits but was not eligible for LTD benefits because of her non-participation in the examination.

However, three months after Plaintiff received SSD benefits, Defendant asserted that the medical documentation of Plaintiff's illness "d[id] not substantiate [her] disability ...." (AR 695, 739). Thus, I **FIND** Defendant's failure to explain the inconsistency between the SSD determination and the finding that Plaintiff had insufficient documentation of her disability is a factor to be weighed in ascertaining whether that decision was arbitrary and capricious.

### 4. The decision to terminate benefits and subsequent appeals denials.

■■■ According to Defendant, Plaintiff failed or refused to attend a scheduled INE, failed or refused to cooperate with respect to the evaluation of her disability, and failed to provide proof of continuing disability when she did not complete the INE on January 10, 2007 (AR 698–99, 739, 822). Each of these is an independent ground for termination of benefits under the Plan (AR 481–82).

### a. Attendance at the INE

Insofar as Defendant's decision rested on Plaintiff's failure to attend the INE, that decision is inconsistent with Defen-

dant's own characterization of Plaintiff's actions. Defendant's correspondence to Plaintiff explaining the denial of her first appeal acknowledged Plaintiff's attendance: "On 01/10/2007, you attended an Independent Medical Examination with Dr. Kristie J. Nies." (AR 726). Paradoxically, however, the first appeal was denied for Plaintiff's "fail[ure] or refus[al] to attend an examination" (AR 739). It is clear that the termination of benefits was not premised on Plaintiff's failure to *attend* the INE, but was instead premised on her failure to *participate in and complete* the INE.

### b. Cooperation with the evaluation

#### i. Procedural abuse of discretion

The Plan excludes a participant from eligibility for LTD benefits if she "fails or refuses to cooperate with respect to the evaluation of [her] ... continuing Total Disability." (AR 481–82). Plaintiff argues the termination of her benefits based on her failure to complete the scheduled INE is arbitrary and capricious, characterizing it as a decision that she was "too disabled to prove her disability." [Doc. 30 at 14]. Defendant responds that "[t]here is no dispute ... that Plaintiff refused to go through with the January 10, 2007, INE." [Doc. 34 at 19]. Aside from this conclusory statement, however, Defendant does not explain why Plaintiff's failure to complete the INE was a failure to cooperate. When Defendant terminated Plaintiff's benefits, the "explanation" merely recited the Plan language (viz., the exclusion for "refus[al] to cooperate") and quoted Dr. Nies' observations (viz., that Plaintiff had a letter from her physician stating she was "medically unable" to participate and that she stated she "was not refusing" but "could not" participate because of her "doctor's orders") (AR 698). Defendant failed to explain why Plaintiff's conduct justified the conclusion that she refused to cooperate. Thus, when Plaintiff's benefits were termi-

nated, Defendant did not engage in the deliberative, principled reasoning process required of plan administrators. *See Bennett*, 514 F.3d at 556 (mere conclusion was insufficient to show reasoned decision); *Elliott*, 473 F.3d at 618.

In addition, Defendant's failure to adequately explain its decision runs afoul of 29 C.F.R. § 2560.503–1(g), which requires Defendant to "set forth, in a manner calculated to be understood by the claimant ... [t]he *specific* reason or reasons for the adverse determination" and to describe "any additional material or information necessary ... to perfect the claim and an *explanation* of why such material or information is necessary" (emphasis added). In the termination letter, Defendant should have explained not only why it considered Plaintiff's conduct to be a refusal to cooperate, but also why her physician's letter was inadequate to excuse her from the INE, and what additional information was necessary to perfect her claim. I therefore **CONCLUDE** Defendant's failure to explain its decision was procedurally arbitrary and capricious.

#### ii. Substantive abuse of discretion

Defendant was aware that Plaintiff arrived at her appointment but had a doctor's order not to participate (AR 698). If Plaintiff was indeed unable to undergo the INE, then her failure to do so cannot be said to be a failure or refusal to cooperate. To be sure, Defendant has the discretion to interpret the terms of the Plan (AR 489), but the term "cooperate" can only stretch so far. It cannot reasonably be interpreted to require a claimant to complete a test that she is medically unable to complete. To permit such an interpretation would give plan administrators the unfettered power to design impossible tests and deny claims with no effective review. The soundness of Defendant's decision, therefore, turns on whether the

Record can support a conclusion that Plaintiff was able, but unwilling, to participate in the INE. *See Lukpetris v. Hartford Life and Acc. Ins. Co.,* 2007 WL 1565759, at *6–7 (W.D.Mich. May 29, 2007) (employee's repeated failure to respond to employer's requests that he participate in a rehabilitation program was substantial evidence he refused to cooperate). If Plaintiff's objections were reasonable, she cannot be denied benefits for being uncooperative. *See Acierno v. First Unum Life Ins. Co.,* 2002 WL 1208616, at *3 (E.D.N.Y. Mar. 31, 2002) (stating that failure to submit to an independent medical examination will bar the employee from receiving ERISA benefits unless the employee stated a *"reasonable* and timely objection to the scheduled location, date, or time, or to particular risks which the examination might pose") (emphasis added).

The Record is clear that Plaintiff appeared at the scheduled time and place but believed herself unable to participate in the scheduled INE (AR 683, 688). Her physician opined she was "medically unable" to participate in a standard INE (AR 683). In addition, she was "adamant that she was not refusing" the examination but "could not" participate (AR 688). Furthermore, Plaintiff walked with a cane and with the assistance of her husband on the day of the examination *(id.).* In addition, her hand was bandaged and she needed her husband's assistance to fill out forms, which is significant in light of the fact that the scheduled 6–8 hour INE was to include "paper and pencil tasks" and computer tests (AR 488, 680, 688). The Record also shows that, during a previous INE, Plaintiff exhibited "emotional decontrol," causing the evaluation to "t[ake] longer than expected" (AR 537). These symptoms were reported to be "true and genuine," with no malingering *(id.).* The only reasonable interpretation of the evidence available to Defendant is that Plaintiff

needed *at least* to reschedule the examination. No such opportunity was provided, nor did Defendant even suggest it might be a possibility, until well after Plaintiff's benefits were terminated (AR 805).

Defendant has shown nothing in the Record supporting its conclusion that Plaintiff refused to cooperate. Defendant argues Plaintiff could not have been unable to participate because she had completed a similar examination with Dr. Fuchs in March of 2006 [Doc. 34 at 19]. This argument is unpersuasive. First, Defendant maintains it did not know of Dr. Fuchs' examination when it terminated Plaintiff's benefits (AR 821–22). Second, the argument misses the point. There is nothing in the Record to suggest Plaintiff would not have been able to participate in an INE on a different date or with accommodations had she been allowed to do so. As Plaintiff notes, the very nature of relapsing/remitting MS consists of "wax[ing] and wan[ing]" symptoms (AR 818). Furthermore, in the intervening period between Dr. Fuch's evaluation and the scheduled INE, the Record shows Plaintiff's condition took a turn for the worse and she was hospitalized for three weeks (AR 800).

Defendant also argues that Dr. Hollandsworth's opinion that Plaintiff was unable to complete a "standard neuropsychological testing battery" was properly rejected because it was not detailed enough—specifically, because Dr. Hollandsworth did not define what a "standard" battery would include [Doc. 34 at 20]. Yet, the Record shows Defendant's former third party administrator, Broadspire, had specifically requested that Plaintiff undergo a "standard battery neuropsych eval, with standard questions" (AR 515). Under these circumstances, rejection of Dr. Hollandsworth's opinion for utilizing the same language employed by

Broadspire would be arbitrary and capricious.

In addition, Defendant argues that Dr. Hollandsworth's letter should have included "medical documentation" (AR 739) or "objective evidence" of his conclusion that Plaintiff was unable to participate in the exam [Doc. 34 at 20]. Again, Defendant's argument misses the point. First, Defendant points to no medical evidence contradicting Dr. Hollandsworth's assessment of Plaintiff's condition or Plaintiff's credibility. Defendant must have some substantial evidence that Plaintiff was uncooperative in order to justify terminating her benefits on that basis. Even Defendant's own independent examiner had previously opined that Plaintiff was cooperative in her first INE and her symptoms were "true and genuine," with no evidence of malingering (AR 532, 537). Second, Defendant did not inform Plaintiff that her physician's opinion needed more "medical documentation" of her inability to participate in the INE until three months *after* the termination of her benefits (AR 739).[8]

Finally, Defendant argues Plaintiff should have submitted information from multiple physicians or that her physician should have suggested some appropriate accommodations for her condition [Doc. 34 at 20]. Yet, when Plaintiff complained she was not able to take the test, Defendant simply instructed her to submit a letter to that effect from her physician, and Plaintiff did so (AR 683, 801). If Defendant required multiple letters from various physicians or specific recommendations for accommodations, Defendant should have notified Plaintiff and given her the opportunity to provide them. Therefore, I CONCLUDE Defendant's termination of Plaintiff's benefits was substantively arbitrary and capricious because there is no substantial evidence in the Record that Plaintiff was able to participate in the INE but refused to do so.

Accordingly, I **RECOMMEND** that Plaintiff's motion for judgment, to the extent it seeks to invalidate Defendant's termination of her LTD benefits as arbitrary and capricious, be **GRANTED.**

#### c. Failure to provide proof

Plaintiff asserts the Record shows she is totally disabled from performing any occupation and on that basis seeks a retroactive award of benefits [Doc. 35 at 11–13]. Because the plan administrator is vested with the discretion to determine whether a claimant is totally disabled, a court's review is limited to determining whether the administrator's decision was arbitrary and capricious. *See Calvert*, 409 F.3d at 291–92. Defendant contends it has made "no decision . . . as to Plaintiff's eligibility for benefits" and its decision rested solely on Plaintiff's failure to complete the INE [Doc. 34 at 17–18]. I **CONCLUDE** it would be improper for the Court to grant the requested relief if Defendant has made no decision for the Court to review.

In denying Plaintiff's first appeal, Defendant determined that Plaintiff failed "to provide proof of continuing disability as requested" (AR 699). This is apparently a reference to Plaintiff's obligation under the Plan "to provide . . . information necessary to evaluate [her] medical condition and functional capacity" (AR 480). In addition, Defendant concluded Plaintiff's "medical documentation . . . d[id] not substantiate [her] disability . . . ." (AR 739). I **FIND** Defendant has not determined whether Plaintiff is indeed totally disabled from performing any occupation. In context, Defendant's statement that the "documen-

---

8. As noted above, this three-month failure to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary" was a violation of 29 C.F.R. § 2560.503–1(g).

tation d[id] not substantiate [Plaintiff's] disability" is not a finding that Plaintiff was *not* disabled, but merely a finding that, without the requested INE, there was insufficient information in the Record to make that decision. Furthermore, for the reasons below, I **CONCLUDE** it was not arbitrary and capricious for Defendant to determine there was insufficient information to support a finding of total disability.

As discussed above, the Court must consider Defendant's inconsistent positions with respect to an award of SSD benefits. Defendant not only encouraged Plaintiff to apply for SSD, but required her to do so and assisted her in that process (AR 565–66, 596). Defendant also benefitted financially from Plaintiff's award, as her LTD benefits were offset by the amount of SSD benefits (AR 496). Eligibility for SSD benefits requires a determination that a claimant is unable to perform any gainful work, and it is somewhat inconsistent for Defendant to conclude Plaintiff had not shown she was unable to work in any occupation. See *Bennett,* 514 F.3d at 554. However, although the inconsistency must be considered, it carries little weight on these facts. An ERISA plan's requirements may be more stringent than the SSA's, and evidence sufficient to support an award by the latter may not qualify a claimant under the requirements of the former. See *DeLisle,* 558 F.3d at 445–46.

Furthermore, the propriety of Defendant's decision must be evaluated by considering the Record as it existed when the decision was made. See *Moon v. Unum Provident Corp.,* 405 F.3d 373, 378 (6th Cir.2005). When Defendant denied Plaintiff's first appeal, the Record did not contain the evaluation by Dr. Fuchs (AR 821). The Plan placed the burden of providing proof of disability on Plaintiff (AR 480), and according to Defendant, without Dr. Fuchs' report, the Record contained "no

measurable objective testing validating [Plaintiff's] complaints of cognitive deficits." (AR 822). Defendant is entitled to request objective evidence of a claimant's subjective complaints and medical opinions based on those subjective complaints. *Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 166 (6th Cir.2007) ("Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."). Moreover, Defendant's position is supported by substantial evidence: Dr. Nies concluded from her review of the Record (without Dr. Fuchs' report) that there was insufficient evidence to determine whether Plaintiff was able to perform any occupation (AR 688).

In summary, Defendant's determination that the Record is insufficient to determine Plaintiff's continuing eligibility for benefits was not arbitrary and capricious, but the determination that Plaintiff's failure to complete the scheduled INE constituted a failure or refusal to attend or cooperate was arbitrary and capricious. For these reasons, I **RECOMMEND** that Plaintiff's request for a retroactive award of benefits be **DENIED,** but that Plaintiff's cause be **REMANDED** to Defendant for further consideration of whether she is totally disabled under the "any occupation" definition. See *Shelby County Health Care Corp. v. Majestic Star Casino,* 581 F.3d 355, 373 (6th Cir.2009) (citing *Caldwell v. Life Ins. Co. of N. Am.,* 287 F.3d 1276, 1288 (10th Cir.2002)) (where administrator fails to adequately explain the grounds of its decision, remand is the appropriate remedy); *Proffitt v. Group Long Term Disability Plan for Family Practice Center,* No. 2:06–cv–97, 2007 WL 2692177, at *11 (E.D.Tenn. Sep. 12, 2007) (where it was unclear whether claimant was entitled to benefits under the "any occupation" provision, remand was appropriate remedy). In light of this recommendation, the Court

need not reach Plaintiff's request for prejudgment interest at this time.

### C. Attorney's Fees

 Plaintiff also seeks attorney's fees under 29 U.S.C. § 1132(g), but has submitted no information regarding the amount of her attorney's fees. The Court has discretion to allow reasonable attorney's fees and is guided by a five-factor test: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party seeking fees sought to confer a common benefit on other participants or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *Moon v. Unum Provident Corp.,* 461 F.3d 639, 642 (6th Cir.2006). Fees may be awarded to a plaintiff who, even though she has not "experienced ultimate success in the sense of winning [her] benefits claim against Defendant, ... has received another shot at those benefits by achieving a remand." *McKay v. Reliance Standard Life Ins. Co.,* No. 1:06–cv–267, 2009 WL 537197, at *5 (E.D.Tenn. Mar. 3, 2009). However, at this juncture, I **RECOMMEND** that Plaintiff's motion for fees be **DENIED** as premature. *See also* Fed. R.Civ.P. 54(d)(2).

### D. Defendant's Counterclaim

Defendant seeks repayment of $3,314.78 in alleged overpayments of LTD benefits

[Doc. 21 at 27–31]. Because Defendant's termination of Plaintiff's benefits was arbitrary and capricious, I **CONCLUDE** that Defendant has not shown it is entitled to the relief sought, and I **RECOMMEND** Defendant's motion for judgment on the pleadings on the counterclaim be **DENIED.**

## IV. CONCLUSION

 Having carefully reviewed the Record and the pleadings, I **RECOMMEND** that: [9]

(1) Plaintiff's motion to strike portions of the Record [Doc. 29] be **DENIED;**

(2) Defendant's motion to strike portions of the Record be **DENIED;**

(3) Plaintiff's motion for judgment on the Record [Doc. 30] be **GRANTED IN PART** and **DENIED IN PART,** to wit:

 (a) Plaintiff's motion relating to the termination of her LTD benefits be **GRANTED;**

 (b) Plaintiff's motion relating to the retroactive award of LTD benefits, prejudgment interest, and attorney fees be **DENIED;**

 (c) Defendant's decision terminating Plaintiff's LTD benefits be **REVERSED** and this cause be **REMANDED** to Defendant for further consideration; and

9. Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn,* 474 U.S. 140, 149 n. 7, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall,* 806 F.2d 636, 637 (6th Cir.1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers,* 829 F.2d 1370, 1373 (6th Cir.1987).

(4) Defendant's motion for judgment on the pleadings for recovery of alleged overpayments be **DENIED.**